IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 2, 2005

## IN RE  M.J.M., JR., L.P.M., & C.A.O.M.

**Appeal from the Juvenile Court for White County**
**No. JU 1839     Sam Benningfield, Judge**

_____

**No. M2004-02377-COA-R3-PT - Filed April 14, 2005**

_____

This appeal involves a mother's efforts to prevent the termination of her parental rights to her three children while she completes her treatment for methamphetamine addiction. After the Tennessee Department of Children's Services took custody of the children, it devised a permanency plan obligating the mother to address her drug addiction and to complete other remedial tasks within twelve months. However, after six months of the mother's failed attempts to restore order to her life, the Department filed a petition in the White County Juvenile Court to terminate the mother's parental rights. Between the filing of the Department's petition and the hearing, the mother made significant steps toward completing the tasks in the permanency plan. Despite the mother's progress, the juvenile court terminated her parental rights on the grounds of abandonment, failure to comply with the permanency plan, and failure to remedy the conditions that had required the children's removal. The mother has appealed. We have determined that the Department has failed to present clear and convincing evidence of one or more grounds for terminating the mother's parental rights.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Juvenile Court Vacated**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court. WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., filed separate concurring opinions.

Elizabeth Earl McDonald, Sparta, Tennessee, for the appellant, D.M.

Paul G. Summers, Attorney General and Reporter, and Juan G. Villaseñor, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I.

D.M. is the mother of three children:  M.J.M., Jr. who was born on February 9, 1989, C.A.O.M. who was born on November 20, 1991, and L.P.M. who was born on March 9, 1999. D.M.

raised these children in Nashville, Tennessee without the assistance of any of their fathers[1] until she married a co-worker. After their marriage, D.M. and her husband raised her children in a caring, nurturing environment, and by all indications they were a harmonious family.[2]

D.M.'s and her children's lives changed abruptly and dramatically when D.M. and her husband simultaneously lost their jobs. Apparently D.M.'s husband "flipped out" because he could not handle the stress of being suddenly unemployed, and he began directing his anger and frustration toward D.M. and abusing her physically. On one occasion, he knocked her teeth out, broke her nose and ribs, and threatened to kill her. D.M. was able to call for help, and she and her children left the marital home for a battered women's shelter.

No shelter in the vicinity of Nashville would accept D.M. and her children because of the children's ages. Accordingly, they were required to move into a shelter in Cookeville. D.M. knew no one in Cookeville and had no support system there. As it turned out, their stay in the Cookeville shelter was brief because D.M.'s husband discovered their whereabouts and broke into the shelter trying to find her. After this incident, the Cookeville shelter asked D.M. to leave,[3] and she moved to another shelter in Crossville.

D.M. and her children remained in the Crossville shelter for only one month before they were moved to Sparta.[4] D.M. was a stranger to Sparta, and in her words, "I had no transportation, no means. I knew not one single sole in Sparta. They moved me into . . . [Craigrock]. Like I said, I knew no one. . . . I didn't have any resources whatsoever." She lived in the shelter for a short time and then rented an apartment in Sparta for herself and her children. Then she set about trying to find a job, but she was unsuccessful because of her limited education and experience. Her lack of resources and her inability to find work quickly caused her to become depressed.

D.M. had no prior history of substance abuse of any sort. However, after moving to Sparta, she became associated with a group of methamphetamine[5] abusers, and she soon began using the drug herself to ease her feelings of pain and depression. The Tennessee Department of Children's

---

[1] The juvenile court terminated the rights of the children's putative biological fathers even though the evidence does not clearly establish the identity of the fathers of D.M.'s three children. The biological fathers' parental rights are not at issue in this case because they did not participate in the proceedings in the juvenile court and have not perfected a timely appeal from the order terminating their parental rights.

[2] The only problem reflected in the record involved D.M.'s oldest child, M.J.M., Jr., who began having truancy problems when he learned that his biological father had died. The Department was unable to present definitive evidence regarding M.J.M., Jr.'s father's death.

[3] The shelter in Cookeville desired D.M. and her children to move because of an earlier incident in which another one of the shelter's residents had been murdered by the resident's husband.

[4] It is unclear why D.M. and her children were moved to Sparta.

[5] Methamphetamine is a powerfully addictive stimulant that affects the central nervous system. It is manufactured using common household products such as cold tablets and drain cleaner, and it can be snorted, smoked, or dissolved in water and injected. *The Governor's Task Force on Methamphetamine Abuse* (September 1, 2004), *available at* http://www.tennessee.gov/governor/methreport.pdf ("Methamphetamine Task Force Report").

Services received a complaint about D.M. shortly after she began using methamphetamine. When the Department's investigators interviewed her at her apartment on May 22, 2003, D.M. readily admitted that she was injecting methamphetamine two to three times a week and stated that she and the children were facing eviction. After D.M. asked the Department to help her and her children, the Department took the three children into protective custody, and D.M. was arrested.

On May 23, 2003, the Department filed a petition in the White County Juvenile Court seeking temporary custody of D.M.'s children. On May 30, 2003, D.M. and representatives of the Department entered into a permanency plan with a goal to reunite D.M. and her children, who by then had been placed in foster care. The plan required D.M. to (1) submit to an alcohol and drug assessment and follow its recommendations, (2) submit to random drug screens, (3) find a safe and drug-free environment for herself and her children, (4) obtain legal income, (5) remain involved with the children's educational progress and ensure that they attend school on a regular basis, (6) clear all pending legal issues, (7) obtain a mental health assessment and follow its recommendations, and (8) acquire adequate transportation. Knowing the challenges facing D.M., the Department's employees determined that it would take one year for D.M. to complete her obligations. Accordingly, the permanency plan projected that the completion date for fulfilling her responsibilities would be May 22, 2004.

Despite the Department's offers of assistance during the months immediately following the first permanency plan, D.M was unable to free herself from the grip of methamphetamine. She kept using the drug to avoid her anguish over losing her children. During this period, D.M. slipped in and out of contact with the Department, spent time in jail for her prior drug possession charges, and continued to use methamphetamine. She also made little to no effort to complete any of her responsibilities in the permanency plan.

Following their removal from D.M.'s custody, her three children were placed in the same foster home. The two youngest children adapted well to their new surroundings, but the oldest child had difficulties. He was upset about the death of his father. His anger manifested itself in his refusal to abide by the rules of his foster home and his physical abuse of other children in the neighborhood. He also expressed to his foster parents and others that he felt like he was being punished for his mother's wrongdoing. As time passed, the foster parents developed such a close relationship with D.M.'s two youngest children that they decided to adopt them. However, they asked the Department to remove D.M.'s oldest child from their home. The Department complied and split up the brothers.[6]

Immediately after the children were removed from D.M.'s custody, the Department arranged for D.M. to have supervised visits with her children at a location relatively close to where she was living. Even though she did not own an automobile, D.M. was able to attend these visits fairly regularly by either walking or hitchhiking. For some unknown reason, the Department decided to move the visitation from Sparta to Cookeville.[7] The change in location made it far more difficult

---

[6]The events of the oldest child's life after this point are not clear in the record. The evidence is conflicting as to whether he lived in two or six other foster homes after he was separated from his brothers.

[7]The distance between Sparta and Cookeville is approximately twenty miles.

for D.M. to visit her children. When she complained to the Department, she was told to use some sort of publically subsidized transportation. This alternative proved unworkable, however, because the driver assigned to pick up D.M. refused to pick her up because of a personal conflict between the two women.

By November 2003, the Department gave up on D.M. because she still had not freed herself from the grip of methamphetamine and had not yet started working on the tasks assigned to her in the permanency plan. Accordingly, on November 21, 2003 – six months before the permanency plan's completion deadline – the Department filed a petition to terminate D.M.'s parental rights in the White County Juvenile Court. The Department asserted that D.M. had abandoned her children, had failed to substantially comply with the requirements of the permanency plan, and had failed to remedy the conditions that had caused the children to be removed from her custody.

The hearing on this petition was originally scheduled for December 16, 2003, but it was postponed because D.M. had been arrested.[8] D.M. was released from jail on January 3, 2004, and the hearing was rescheduled for March 9, 2004. Apparently D.M. decided during her incarceration to check into a residential treatment program for her addiction. Following her release, she contacted Agape House, a residential treatment facility that had been recommended earlier by the Department. When D.M. mentioned the pending termination hearing, Agape House informed her that she would not be permitted to leave to attend the hearing and recommended that she clear up all her legal problems before checking into the facility.

D.M. began looking for other treatment alternatives that would enable her to complete a residential drug program before the March 9, 2004 trial date. She eventually determined that Buffalo Valley, another treatment facility in Lewisburg, was more flexible and would be better able to help her accommodate the upcoming termination hearing. A few weeks later, D.M. visited with her children for the first time in four months and then checked herself into Buffalo Valley. Upon her arrival at Buffalo Valley, she informed the staff that she had recently used methamphetamine.

The therapy at Buffalo Valley appeared to help D.M. address her methamphetamine addiction. However, D.M. was faced with a serious scheduling problem because her treatment program would not be completed until March 11, 2004, while the termination hearing was scheduled for March 9, 2004. Because she felt a need to prepare for the hearing, D.M. left Buffalo Valley on March 4, 2004 without receiving a certificate of completion.[9]

As it turned out, D.M. did not need to leave her treatment program at Buffalo Valley early to prepare for the March 9, 2004 hearing. On the day of the hearing, the juvenile court decided to postpone the proceeding after discovering that the Department had failed to properly serve the children's biological fathers. Accordingly, the juvenile court continued the trial until April 13, 2004 to enable the Department to obtain service on the biological fathers by publication. At this point,

---

[8]The record does not indicate clearly why D.M. was arrested, although there is some indication that she had been charged with vandalism.

[9]D.M. checked herself out of Buffalo Valley on March 4, 2004, even though Buffalo Valley had offered to provide her a certificate of completion if she remained in the program until March 8, 2004.

having been free of methamphetamine for approximately one month, D.M. found herself presented with an opportunity to take control of her life. She spent the next month working on her responsibilities under the permanency plan without any assistance from the Department.

D.M. first moved back to Nashville where she had family support. She and her grandmother made arrangements for her to rent a two-bedroom downstairs apartment in her grandmother's house, and her grandmother agreed to make two bedrooms upstairs available to her should the children be returned to her custody. She found employment cleaning houses and office buildings that paid eleven dollars per hour, and she began paying rent to her grandmother, as well as one-third of the utilities. D.M.'s grandmother gave her access to one of her automobiles but required her to pay for the gasoline she used. D.M. also made arrangements with Buffalo Valley to obtain her certificate of completion by attending sixty meetings in sixty days. Finally, she began to participate actively in Alcoholics Anonymous, Narcotics Anonymous, and a local church.

The juvenile court conducted a hearing on April 6, 2004 that focused on the parental rights of the children's putative biological fathers. The court turned its attention to D.M. on April 13, 2004. By that time, D.M. had completed fifty-three of the meetings required by Buffalo Valley in just thirty-nine days. She had obtained housing, found a job, and had access to transportation. She had cleared up all her pending legal proceedings and had obtained a referral to a psychiatrist for a mental health assessment. Despite these efforts, the juvenile court filed an order on August 31, 2004 concluding that D.M. had abandoned her children, had failed to comply substantially with the requirements of her permanency plan, and had failed to remedy the conditions that had led to the removal of the children from her custody. The court also determined that the children's interests would be best served by terminating D.M.'s parental rights. D.M. has appealed.

## II.
### THE STANDARDS FOR REVIEWING TERMINATION ORDERS

A biological parent's right[10] to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[11] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

_____

[10]This right exists notwithstanding the marital status of the child's biological parents where a biological parent has established or is attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S. Ct. 2985, 2993-94 (1983); *In re D.A.H.*, 142 S.W.3d 267, 274 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002); *In re Swanson*, 2 S.W.3d 180, 188 n.12 (Tenn. 1999). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995).

[11]U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[12] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[13] Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn. Code Ann. § 36-1-113(i)(1); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996); *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *8 (Tenn. Ct. App. Dec. 30, 2003) (No Tenn. R. App. P. 11 application filed). Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d at 639; *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d at 188. Accordingly, Tenn. Code Ann. § 36-1-113(k) explicitly requires courts terminating parental rights to "enter an order which makes specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re S.M.*, 149 S.W.3d at 639; *In re M.J.B.*, 140 S.W.3d at 653-54. These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d at 367; *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *5 (Tenn. Ct. App. Dec. 23, 2003) (No Tenn. R. App. P. 11 application filed).

The heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1) requires us to adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must

---

[12]The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g) (Supp. 2004).

[13]The factors to be considered in a "best interests" analysis are found in Tenn. Code Ann. § 36-1-113(i).

review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re S.M.*, 149 S.W.3d at 640; *In re M.J.B.*, 140 S.W.3d at 654.[14]

## III.
### THE ADEQUACY OF THE DEPARTMENT'S EVIDENCE OF ABANDONMENT

D.M. takes issue with the juvenile court's conclusion that she abandoned her children. The basis for the court's decision is somewhat unclear because the final decree is inconsistent with the court's ruling from the bench on April 20, 2004.[15] Out of an abundance of caution, we will address all three abandonment grounds mentioned by the juvenile court on April 20, 2004. We have concluded that the Department failed to present clear and convincing evidence that D.M. had abandoned her children on any of these grounds.

### A.
### Abandonment By Willfully Failing To Visit

A parent's failure to visit a child may provide grounds for terminating the parent's parental rights, but only if the parent's failure to visit was "willful" and if it occurred "[f]or a period of four (4) consecutive months immediately preceding the filing of a [termination] proceeding." Tenn. Code Ann. § 36-1-102(1)(A)(i). By statute, "willfully failed to visit" means "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation, as defined by Tenn. Code Ann. § 36-1-102(1)(C), means "that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

The juvenile court found that the six visits that D.M. had with her children between May 2003 and March 2004 amounted to merely token visitation. While six visits during a ten-month period appear to be perfunctory, D.M. insists that they were not in light of her circumstances during

---

[14]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838-39.

[15]During the April 20, 2004 hearing, the juvenile court found that D.M. had abandoned her children on three grounds – failure to visit, failure to support, and failure to secure suitable housing. However, the court's August 31, 2004 order bases the abandonment determination only on failing to visit and failing to secure adequate housing.

that time. She points out that during this period, she was coping with drug addiction, an inability to find employment, and a lack of transportation. Despite these obstacles, she had been visiting her children regularly until the Department, for some reason, moved the location of the visitation to Cookeville. It was far more difficult for D.M. to walk or hitchhike from Sparta to Cookeville, and her visits became less frequent or regular after the alternate transportation arranged by the Department proved to be unworkable.

In addition to the Department's decision to move the visitation to a less convenient location and her transportation problems, D.M. spent forty-one days of this period either in jail or receiving residential treatment at Buffalo Valley. In light of this evidence, we find that the Department failed to present clear and convincing evidence that D.M. had willfully failed to visit her children and, therefore, that the juvenile court erred by concluding that D.M. had abandoned her children by willfully failing to visit them.

## B.
### Abandonment By Willfully Failing To Secure Suitable Housing

A parent can also abandon a child by failing to make reasonable efforts to provide a suitable home for his or her child during the four month period following the removal of the child from the parent's custody. Tenn. Code Ann. § 36-1-102(1)(A)(ii). However, to warrant finding abandonment on this ground, the Department must establish that it "has made reasonable efforts to assist the parent(s) . . . to establish a suitable home for the child." Tenn. Code Ann. § 36-1-102(1)(A)(ii). The pivotal question in this case is whether the Department proved that its efforts to assist D.M. in obtaining suitable housing were reasonable.

D.M. was beset with serious problems during the four months immediately following the removal of her children from her custody. In addition to facing incarceration for her possession and use of methamphetamine, she had the challenge of finding effective treatment for her addiction and of somehow securing employment to enable her to support herself and her children. As if these tasks were not difficult in and of themselves, D.M. had no transportation of her own and was living in a locale that was entirely unfamiliar to her without family or friends to provide her with support and assistance.

Despite its knowledge of D.M.'s predicament, the Department simply gave her a printout of rental properties in the Cookeville area and offered to provide D.M. with "flex funds" to assist her with her first month's rent, security deposits, and utility bills. We find that under the facts of this case, the Department's efforts to assist D.M. in obtaining and keeping suitable housing were woefully deficient and unreasonable. The Department knew or should have known that any efforts to find D.M. housing before she addressed her methamphetamine addiction would be for naught.

The Department, relying on D.M.'s visitation track record, also asserts that D.M. showed such a lack of concern for her children that it was unlikely that she would have obtained suitable housing for them. We have already pointed out that the Department has failed to present clear and convincing evidence that D.M.'s infrequent visitations with her children were willful. In addition, by the time of the April 13, 2004 hearing, D.M. had found ostensibly suitable housing for herself and

her children. Under these circumstances, the Department has failed to present clear and convincing evidence that D.M. abandoned her children by willfully failing to secure suitable housing.

## C.
### Abandonment By Willfully Failing To Support

The juvenile court's August 31, 2004 order does not explicitly find that D.M. abandoned her children by willfully failing to support them. However, during the April 20, 2004 hearing, the court announced that it had determined that D.M. had, in fact, abandoned her children by willfully failing to support them. Even though the court's failure to make a written finding on this ground is contrary to Tenn. Code Ann. § 36-1-113(k),[16] both parties have briefed the abandonment by failure to support issue. Mindful of the Tennessee Supreme Court's admonition to address all grounds asserted in a termination complaint, *see In re D.L.B.*, 118 S.W.3d at 367, we will address this ground even though it is not mentioned in the juvenile court's final order.

A parent's failure to support a child financially may also provide grounds for terminating the parent's parental rights, but only if the parent's failure to support was "willful" and if it occurred "for a period of four (4) consecutive months immediately preceding the filing of a [termination] petition." Tenn. Code Ann. § 36-1-102(1)(A)(i). By statute, "willfully failed to support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support, as defined by Tenn. Code Ann. § 36-1-102(1)(B), means "that the support, under the circumstances of the individual case, is insignificant given the parent's means." A parent's ability to pay support is a factor in determining willfulness.[17] *Department of Children's Servs. v. Lewis*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *52 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

All parents have an obligation to support their children. *In re M.J.B.*, 140 S.W.3d at 655. This obligation continues until the child reaches the age of majority, Tenn. Code Ann. § 34-1-102(a), (b) (2001), and it may even continue after the Department has taken custody of the child. Tenn. Code Ann. § 37-1-151 (Supp. 2004) (permitting juvenile courts to require parents to support children in the State's custody if the parents are able to contribute to the support of the child). However, as we have recently noted:

> [W]hen parents no longer have custody of their children, the nature and extent of their duty may be defined and controlled by external factors other than the parents' ability to support. In these circumstances, the nature and extent of the duty to support may be

---

[16] *In re S.M.*, 149 S.W.3d at 639 (failure to comply with Tenn. Code Ann. § 36-1-113(k) invalidates a termination order).

[17] A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child. *In re F.R.R., III,* No. M2004-02208-COA-R3-PT, 2005 WL 473470, *4 n.6 (Tenn. Ct. App. March 1, 2005); *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Pierce v. Bechtold*, 60 Tenn. App. 478, 487, 448 S.W.2d 425, 429 (1969).

based on a court order defining the support obligation. When a child has been placed in the Department's custody in a dependent-neglect proceeding, a parent's support obligation may also be defined by the permanency plan for the child.

*In re M.J.B.*, 140 S.W.3d at 655.

The May 30, 2003 permanency plan did not require D.M. to contribute monetarily to her children's support, and the juvenile court never ordered her to pay support for her children after they were removed from her custody. The reason for this is obvious: D.M. at the time was unable to contribute to her children's support. She was battling her methamphetamine addiction and struggling to find employment, all without transportation and without the support of family or acquaintances. Under these circumstances, we conclude that the Department failed to present clear and convincing evidence that D.M. was willfully failing to support her children and, therefore, that the juvenile court erred by concluding that she had abandoned her children by willfully failing to support them.

## IV.
### THE MOTHER'S COMPLIANCE WITH THE REQUIREMENTS OF HER PERMANENCY PLAN

D.M. next takes issue with the juvenile court's conclusion that she had failed to substantially comply with the obligations in the May 30, 2003 plan. She points out that the trial court focused on her failures immediately following the removal of her children and gave little weight to her accomplishments during the four months prior to the termination hearing. The Department, while not disputing what D.M. had been able to accomplish on her own, dismisses her efforts as being "too little, too late." We disagree with the Department's characterization of D.M.'s efforts.

Parents may lose their parental rights by failing to substantially comply with the statement of responsibilities in the child's permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). To terminate parental rights on this ground, the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re M.J.B.*, 140 S.W.3d at 656-57. In addition, trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re M.J.B.,* 140 S.W.3d at 657.

The juvenile court briefly alluded to D.M.'s efforts between January and April 2004 to rehabilitate herself. While the court acknowledged D.M.'s testimony that she was continuing to receive alcohol and drug treatment and that she had obtained employment, it appeared to devalue this information because D.M. did not present corroborating evidence. The juvenile court also concluded that D.M. had produced no evidence that she had stayed involved with her children's education, that she had resolved her pending legal difficulties, and that she had obtained a mental health assessment and followed through with all recommended treatment. The court, characterizing D.M.'s efforts as

"11th hour," observed that while D.M. "may have started compliance on some aspects of her permanency plan, she has not completed anything."

We respectfully disagree with the juvenile court's characterization of the evidence. First, the court's conclusion that D.M.'s testimony regarding her alcohol and drug treatments was uncorroborated is incorrect. In addition to D.M's description of her efforts to achieve and maintain sobriety, D.M.'s grandmother testified at length about D.M.'s involvement in alcohol and drug treatment and her new employment. Second, contrary to the court's observation, the record contains evidence regarding D.M.'s efforts to address the permanency plan's other requirements. D.M. testified at trial that she had cleared up all legal issues unrelated to the termination hearing. She also discussed her referral for a mental health assessment. Finally, she testified about her efforts to follow Buffalo Valley's post-release treatment recommendations. The Department did not dispute any of this testimony.

D.M. conceded that she had not been able to accomplish her obligation to remain involved in her children's education and to make sure that they attended school.[18] It is difficult to understand how this shortcoming can be viewed as material in light of two facts. First, D.M. lost all control over her children when they were taken from her in May 2003. Second, D.M. was not permitted to even visit her children after the Department unilaterally suspended her visitation in March 2004. This evidence, coupled with D.M.'s and her grandmother's testimony regarding D.M.'s employment, living, and transportation arrangements, demonstrates that D.M. had made substantial efforts to fulfill her responsibilities under the permanency plan.

Even though we have determined that D.M. made substantial efforts to satisfy the requirements of the May 30, 2003 permanency plan, we must still determine whether her efforts were truly at the "11th hour" and thus "too little, too late." To address this issue, we must accurately understand the challenge D.M. faces to overcome her methamphetamine addiction. Methamphetamine is powerfully addictive.[19] It has one of the highest recidivism rates of all abused substances.[20] Research demonstrates that a severe methamphetamine abuser's brain functioning does not return to normal for up to one year after the abuse ends.[21] According to Dr. John Averitt, a psychologist and drug treatment counselor in Cookeville, Tennessee, "[a] chronic meth user's brain is never the same again. Normal pleasures, like a trip to the beach or a pleasant meal, no longer feel good. You've got to keep using the drug to feel that pleasure, or take the drug to stop the terrible feelings that result."[22] For these reasons, the Tennessee Governor's Task Force recommends

---

[18]As best as we can determine, this obligation stemmed from M.J.M., Jr.'s truancy problems immediately after he learned that his father had died.

[19]Methamphetamine Task Force Report, *available at* http://www.tennessee.gov/governor/methreport.pdf.

[20]*See* Methamphetamine Task Force Report (stating that as many as 90% of addicts return to the drug).

[21]*See* Methamphetamine Task Force Report.

[22]*See* Methamphetamine Task Force Report.

treatment programs with durations of at least twelve months to help recovering methamphetamine addicts.[23]

D.M. faced, and most likely continues to face, an uphill battle in addressing her addiction. Given the longevity of methamphetamine's effects on the body, it is not surprising that she was unable to control her addiction within a few weeks or even a few months of entering into the Department's permanency plan. Judging by the permanency plan's projected completion date of May 2004, it appears that the Department itself did not expect D.M. to fulfill all her responsibilities within a few months. Yet despite the seriousness of D.M.'s situation, the Department waited only six months to file its termination petition. Then approximately three months later, the Department told D.M. that she would no longer be permitted to see her children and that she should no longer expect the Department to help her meet the goals set out for her in the permanency plan.

The Department argues that D.M.'s efforts were "too little, too late." This "too little, too late" concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans. *In re A.R.G.*, No. M2004-00894-COA-R3-PT, 2005 WL 457282, at *5 (Tenn. Ct. App., Feb. 25, 2005) (No Tenn. R. App. P. 11 application filed) (citing *In re A.W.*, 114 S.W.3d at 541; *State v. Pruitt*, No. M2000-00416-COA-R3-CV, 2000 WL 827957, at *29-30 (Tenn. Ct. App. June 27, 2000) (No Tenn. R. App. P. 11 application filed)). While the concept has merit in proper circumstances, the courts should not permit the Department to use it as a convenient way to circumvent its obligation to continue to provide reasonable support to a parent during the permanency plan's rehabilitation period.

The Department and its professional staff must know and understand that persons with addictions to substances as powerful as methamphetamine have false starts and set backs, as well as successes and, regrettably, backsliding. The Department appears to have recognized this reality in D.M.'s case because the May 30, 2003 permanency plan gave her twelve months to accomplish the goals that the Department had set for her. D.M. clearly had false starts and setbacks during the first nine months. By the time D.M. began to regain control of her life, the permanency plan's completion date was still three months away. However, she received no support from the Department because the Department had already given up on her. While D.M.'s efforts may have been "too little" at one point, they eventually proved not to be "too late." Because the juvenile court went too far in devaluing D.M.'s efforts to fulfill her obligations, we have concluded the court erred by concluding that she had failed to substantially comply with the requirements of the May 30, 2003 permanency plan.

## V.
### THE MOTHER'S FAILURE TO REMEDY THE CONDITIONS THAT ORIGINALLY CAUSED THE REMOVAL OF HER CHILDREN

Finally, D.M. takes issue with the juvenile court's conclusion that her parental rights should be terminated because she has failed to remedy the conditions that caused the Department to remove

---

[23]*See* Methamphetamine Task Force Report.

her children from her custody.[24]  This finding appears to be based on D.M.'s methamphetamine addiction and her continued drug use for several months following the removal of her children.[25] We find that the Department failed to present clear and convincing evidence that D.M. had not successfully addressed her drug addiction by the time of the April 13, 2004 trial.

The Department appears to be arguing here that Tenn. Code Ann. § 36-1-113(g)(3)(A) requires a parent to remedy the conditions which led to the child's removal within six months immediately following the removal.  This is not what the statute says.  The statute simply states that the child must be removed from the home for a period of six months before this ground will apply. The time for compliance is established in the permanency plan.

In this case, the Department determined that D.M. would need twelve months, or until May 2004, to accomplish the goals it devised for her in the permanency plan.  This time period was reasonable, if not somewhat ambitious, given the obstacles facing D.M.  However, for reasons not entirely evident in the record, the Department gave up on D.M. after only six months and filed its petition to terminate her parental rights in November 2003.  After the Department filed its petition, it made little, if any, efforts to assist D.M. or to keep up with her progress.  By the time of the April 2004 hearing – which was itself one month before the permanency plan's deadline – D.M. had not used drugs for approximately two months, and she was close to completing the Buffalo Valley treatment program.[26]

D.M.'s post January 2004 efforts to address her substance abuse problem prevent us from concluding that the Department presented clear and convincing evidence that D.M. had failed to remedy the condition that had originally caused her children to be taken away from her.  The Department, by failing to rebut D.M.'s testimony, has failed to eliminate any serious or substantial doubt regarding the correctness of its assertion that D.M. has failed to address her substance abuse problem.  Accordingly, we find that the juvenile court erred by determining that D.M.'s parental rights should be terminated because she has failed to remedy the conditions that originally required to Department to remove her children.

---

[24]Tenn. Code Ann. § 36-1-113(g)(3)(A) sets forth the following grounds for terminating a parent's parental rights:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:  (i)  The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist; (ii)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and  (iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

[25]One of the Department's witnesses testified that had it not been for D.M.'s use of methamphetamine, the Department would not have removed the children from her custody.

[26]Based on D.M.'s testimony, she should have completed the rehabilitation program at Buffalo Valley before May 2004 – the deadline in the May 2003 permanency plan.

# VI.
## THE BEST INTERESTS OF THE CHILDREN

A court hearing a termination case should not proceed to the "best interests" analysis required by Tenn. Code Ann. § 36-1-113(c)(2) until it has determined that the Department has proved one or more substantive ground for termination. *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *5-6 (Tenn. Ct. App. Jan. 11, 2005) *perm. app. denied*, (Tenn. Mar. 21, 2005); *In re S.M.*, 149 S.W.3d at 643; *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *10 (Tenn. Ct. App. Feb. 14, 2002) (No Tenn. R. App. P. 11 application filed). Because the Department failed to present clear and convincing evidence establishing one or more grounds for terminating D.M.'s parental rights, the trial court should not have launched into a best interests analysis.[27]

# VII.

We vacate the August 31, 2004 order terminating D.M.'s parental rights regarding her three children and remand the case to the juvenile court for further proceedings consistent with this opinion. We tax the costs of this appeal to the Tennessee Department of Children's Services.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[27]Were we to address the substantive merits of the juvenile court's best interests analysis, we would question whether terminating D.M.'s parental rights with regard to her oldest child, M.J.M., Jr., is in his best interests and whether M.J.M., Jr.'s interests would be best served by permanently separating him from his two younger brothers.